Filed 9/16/16  In re Tristen W. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re TRISTEN W., A Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY BUREAU OF CHILDREN & FAMILY SERVICES, Plaintiff and Respondent, v. JAMES B., Defendant and Appellant. | A147682 (Contra Costa County Super. Ct. No. J14-01194) |

In this dependency appeal, James B. seeks relief from the juvenile court order terminating his parental  rights with respect to his son Tristen W. (born in June 2012). Appellant raises a single issue in this appeal, contending that termination of his parental rights was improper under the "beneficial relationship" exception to adoption.  We affirm.

## I.  BACKGROUND[1]

On November 7, 2014, the Contra Costa County Bureau of Children and Family Services (Department) filed a dependency petition in this matter pursuant to

_____

[1] Given the narrow scope of this appeal, we focus our factual summary on matters relevant to the strength and quality of father's relationship with Tristen.

1

subdivision (b) of section 300 of the Welfare and Institutions Code,[2] after Laura W. (mother) and Tristen's half-sibling—who mother had just given birth to in the family home—both tested positive for methamphetamine. The petition alleged a history of substance abuse for both parents as well as an unsanitary home, due to an infestation of rats. Both two-year-old Tristen and his infant half-sibling, Jacob, were removed from their parents and placed together in foster care.[3] At the detention hearing on November 10, 2014, the minors were formally detained and the matter was set for a jurisdictional hearing. Father was elevated to presumed father status with respect to Tristen and granted supervised visitation, a minimum of once per week for one hour.

Mother and father had been involved in a relationship for nine years, but had not been dating for the last three. Thus, although they were living together at the time of Tristen's detention, they were not a couple. In fact, mother had been dating Jacob's father Ryan U. for the past year. Mother reported being depressed, frustrated, and anxious about the situation with father. She said that father would not allow her to leave, and she felt trapped in her home. She also described him as controlling and abusive. Mother further reported that their relationship had deteriorated over the past year, and she had obtained a restraining order against father, but had been unable to serve him. Father described his relationship with mother as "fragile." He was aware of the restraining order, but stated that he had never threatened or hit mother. He also reported that mother was free to come and go from the property as she pleased, but she chose to stay in the home. Father stated that he understood that mother was now in a new relationship and that he must move on. He claimed not to know that mother was pregnant until several months before the baby's birth and stated that he was unaware that mother was using methamphetamines until about two weeks before the birth.

Mother and father also have an older son together, Thomas B., who lives with his paternal aunt. In March 2007, mother and baby Thomas had both tested positive for an

---

[2] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3] Jacob's alleged father, Ryan U., has not been involved in these proceedings.

illegal substance and mother had not had any prenatal care. Thomas was therefore removed by the Department, but was later returned to the care of mother and father after they successfully completed their case plan. Thereafter, however, in September 2014, a paternal aunt was granted temporary guardianship of Thomas.

Prior to Tristen's detention, the family lived in a small room that was located in a wooded area next to a walking trail. The room was filled with many personal items and contained two couches and a sink. The outside of the home was cluttered with debris and other miscellaneous objects. Father admitted that they had a rodent infestation and that they had placed rat bait all over the property. He understood that the home was not a suitable place for a child.

Several months earlier, in July 2014, Tristen had been found wandering alone on a hiking trail. The parents were admonished by the Department and provided with resources. The social worker expressed concern about the unsafe and unsanitary conditions to which Tristen was exposed. At that time, father had agreed and indicated that he was looking for a more suitable residence.

When Tristen was removed from the family home, father was visibly upset. Tristen was also crying, but eventually settled down and began to talk with the social worker. Father provided toys and clothing for the boy, and asked how he was doing when he met with the social worker the next day.

Father reported to the social worker that he had been clean and sober from alcohol, his drug of choice, for seven years. However, he had relapsed twice on methamphetamine in 2013. He had a sponsor that he checked in with and some clean and sober friends with whom he met occasionally. Father also has a history of arrests from 1988 through 2013, with convictions for vehicle theft (1989), possession of a controlled substance (two in 2002, and 2005), and driving with a suspended license (2010).

At the jurisdictional hearing on December 4, 2014, both parents submitted the matter on an amended petition and the court found Tristen to be a child described by subdivision (b) of section 300. The amended allegation with respect to father stated: "The father has a substance abuse history and admitted to relapsing in 2013, thus placing

3

the child at risk of harm." Father's visitation with Tristen remained once per week as previously ordered.

In advance of the dispositional hearing, father stated he was willing to drug test, take a parenting class, complete a drug assessment, and follow the assessment's recommendations. He also agreed to work with his landlord on safety and sanitary issues, as he acknowledged that his home was not as clean and sanitary as it should have been for Tristen. Moreover, he planned to talk to mother about whether she wished to reunify with him or Mr. U. Father also indicated that he was aware that he had "not always been as dedicated and present to his son" as he should have been. He had "little excuse" for not being aware of mother's drug use and the danger in which it placed Tristen.

Visitation with Tristen was reported to be going well, although father used the visits to question mother about her relationship with Mr. U. The Department was therefore making arrangements for mother and father to have separate visits. In the Department's opinion, father needed "to make some important changes in his life" if he was "sincerely interested" in becoming a full-time father to Tristen. In addition, he needed to decide what to do about his relationship with mother and not rely on her to comply with her reunification plan instead of addressing his own issues.

Both parents submitted the matter at the dispositional hearing on December 19, 2014. As a consequence, the juvenile court declared Tristen to be a juvenile court dependent and ordered family reunification services for both parents. Specifically, father was required to complete a drug and alcohol assessment and follow the recommendations of that assessment, submit to random drug testing, and complete a parenting class. Both parents were warned that—because Tristen was a child under age three at the time of removal—reunification services could be terminated after only six months if they failed to participate regularly and make substantive progress in court-ordered treatment. (See §§ 361.5, subd. (a)(1)(B), 366.21, subd. (e).) Father's visitation with Tristan was maintained at once per week and ordered to be supervised and separate from mother's visitation.

4

Unfortunately, neither parent's efforts at reunification went smoothly. Although mother entered an approved residential drug treatment program, she subsequently tested positive for methamphetamine and marijuana and was therefore discharged after 48 days of treatment. Moreover, after her children were removed, her cash aid stopped and mother was unable to afford a phone or stable housing. As a result, she had difficulty maintaining contact with the social worker, re-entering residential treatment, visiting consistently, or otherwise engaging in services. Her drug testing was sporadic, with one positive test for marijuana and twelve no shows.

For his part, father failed to enroll in a parenting class, be assessed for substance abuse services, or do any random drug testing. He did, however, maintain consistent contact with the social worker. When urged to engage in services, father stated that he was first attempting to find a safe place for Tristen to live. Thereafter, he reported that he had secured a child-appropriate residence, but was not yet ready for the social worker to see it. Father also stated that he did not believe he needed substance abuse assessment or treatment. He expressed anger and frustration, believing he was being punished for mother's drug use even though he did not know she was using drugs, or even that she was pregnant, until almost her due date.

Early in the reunification period, father had trouble maintaining consistent visitation with Tristan. His attendance had more recently improved. Overall, he missed 5 out of 25 visits and was late for nine, once being 40 minutes late. As stated above, father was separated from mother for purposes of visitation after he began using the visits to discuss the case or reconciliation with mother, despite being warned several times about the inappropriateness of these topics. The Department, however, reported him to be appropriate and loving with Tristen during visits. "He readily follow[ed] Tristen's lead during play and [was] comfortable crawling around the floor with his son. When Tristen [fell] or in some other way hurt[] himself, [father was] quick to scoop him up and rock him until Tristen's sobs or sniffles [had] subsided." In addition, father would frequently check Tristen for scrapes and bruises during visits and wanted to know how each injury occurred. According to the Department, "[t]he bond between father and son

5

[was] readily apparent to any observer." Further, Tristen was reported to love his parents and be "solidly attached" to both of them. He enjoyed the visits he had, and was "devastated" when the parents failed to show up.

With respect to Tristen's health and development, it was discovered that father had no information about the boy's medical history, other than knowing he had never been immunized. Tristen's pediatrician additionally reported that the minor was delayed in all areas, especially in the area of speech. Although Tristen had developed a bond with his foster parents, he was frequently frustrated by his inability to communicate with others and would lash out by hitting, kicking, spitting, and throwing things. Tristen also struggled with peer interaction and was aggressive in his play.

Although the Department had "no doubt" that father and mother loved Tristen, it recommended that reunification services be terminated for both parents. With respect to father, the Department noted that Tristen would be at risk if returned to his care because father was not taking any responsibility for the Department's intervention and had not even attempted to engage in services. At the six-month review hearing on June 4, 2015, neither parent appeared and father's attorney submitted the matter on his behalf. Thus, the juvenile court terminated reunification services for both parents and set the matter for a permanency planning hearing pursuant to section 366.26 so that a permanent out-of-home placement could be developed for Tristen. Father's visitation with Tristen was decreased to one time per month.

In advance of the permanency planning hearing, the Department reported that Tristen's foster parents were working closely with his pediatrician to catch the minor up on all immunizations. Although Tristen remained delayed in all areas of development, especially speech, there had been "marked improvements" over the last few months. Tristen's speech was somewhat clearer and his vocabulary had increased. He was also learning his colors and beginning to count. The Department characterized Tristen as "highly adoptable" and asked the court to continue the matter for 120 days so that a prospective adoptive home could be identified for Tristen and his half-sibling, Jacob.

6

Thus, at the original permanency planning hearing on October 1, 2015, the juvenile court continued the case to January 19, 2016.

Thereafter, on November 4, 2015, Tristen and Jacob were moved to the home of prospective adoptive parents. As a consequence, the Department requested that the juvenile court terminate parental rights with respect to both boys and order adoption as the appropriate permanent plan for the minors. It also opined that the current parental relationships for the boys did not outweigh the benefits of adoption.

A contested permanency planning hearing was held on January 19, 2016, at which the juvenile court judge considered termination of parental rights. Father testified that he began a parenting class in September, after reunification services had been terminated, and was scheduled to complete it that day. He also stated that he had attended each monthly visitation with Tristen except the one in December, which he missed due to some confusion as to the date and a work conflict. At the last visit in January, Tristen called him "dad" and was "really happy" to see him. They built a little racetrack together because Tristen likes playing with cars. Tristen also sat in his lap and hugged him. Tristen did not want to be separated from father at the end of the visit, which father reported was always true, although some times were worse than others. Father admitted that he had hit "rock bottom" after losing his family, having a motorcycle accident, and temporarily losing his housing. Getting back on his feet was difficult and he had only gotten "things together again" about a month before the hearing.

The Department argued that, although father and Tristen had pleasant visits, the quality of the relationship was not enough to prevent Tristen from being adopted into a permanent home. Father's attorney, in contrast, argued that father's relationship with Tristen was sufficient to trigger the "beneficial relationship" exception and therefore block Tristen's adoption and the termination of father's parental rights. In the end, the juvenile court terminated the parental rights of both parents, finding Tristen adoptable and refusing to apply the "beneficial relationship" exception to adoption. Father's timely notice of appeal now brings the matter before this court.

## II. THE BENEFICIAL RELATIONSHIP EXCEPTION

As stated above, father contends that—rather than terminating his parental rights—the juvenile court should have applied the "beneficial relationship" exception to block Tristen's adoption. At a permanency planning hearing, the juvenile court is charged with determining the most appropriate permanent plan of out-of-home care for a dependent child that has been unable to reunify. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50 (*Casey D.*).) The permanency planning hearing is designed to protect a dependent child's "compelling" right "to have a placement that is stable, permanent, and allows the caretaker to make a full emotional commitment to the child." (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1320 (*A.A.*).) As the most permanent of the available options, adoption is the plan preferred by the Legislature. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) Thus, if a court finds that a child is likely to be adopted if parental rights are terminated, it *must* select adoption as the permanent plan unless it finds a "compelling reason for determining that termination would be detrimental to the child" due to one or more of the circumstances specified by statute. (§ 366.26, subd. (c)(1)(B); see also *A.A., supra,* 167 Cal.App.4th at p. 1320.) " 'The specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—"must be considered in view of the legislative preference for adoption when reunification efforts have failed." [Citation.] At this stage of the dependency proceedings, "it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home." [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption.' [Citation.]" (*A.A., supra*, 167 Cal.App.4th at p. 1320; see also *In re K.P.* (2012) 203 Cal.App.4th 614, 621 (*K.P.*) [because a permanency planning hearing " 'occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an *extraordinary case* that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement,' " italics added].)

A single statutory exception is implicated in the present case—where termination of parental rights would be detrimental to the child because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The parent bears the burden of proof on both of these prongs: (1) that visitation was consistent and regular; and (2) that the child would benefit from continuing the relationship. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81 (*Helen W.*).) In *Autumn H., supra,* 27 Cal.App.4th at page 575, the court articulated a test for determining whether a child would benefit from continuing a parental relationship. To succeed under this test, the parent must establish that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." In evaluating this issue, the court must balance "the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*) The beneficial relationship exception must be examined on a case-by-case basis, taking into account the many variables which affect the parent/child bond. Factors to be consider include: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between parent and child, and (4) the child's particular needs. (*Id.* at pp. 575-576; see also *In re Angel B.* (2002) 97 Cal.App.4th 454, 467.)

Moreover, for purposes of the beneficial relationship exception, "pleasant and cordial . . . visits are, by themselves, insufficient to mandate a permanent plan other than adoption." (*In re Brian R.* (1991) 2 Cal.App.4th 904, 924 (*Brian R.*).) Indeed, "frequent and loving contact" may also be insufficient to establish the type of beneficial relationship "contemplated by the statute." (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418 (*Beatrice M.*).) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*Autumn H, supra,* 27 Cal.App.4th at

p. 575.) The basis of a beneficial relationship, however, is that the parents have "occupied a parental role." (*Beatrice M., supra,* 29 Cal.App.4th at p. 1419.) " 'While friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent.' " (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*).) Given this analytical framework, we cannot say that the juvenile court erred in this case by refusing to apply the beneficial relationship exception to block Tristen's adoption.[4]

Specifically, we conclude that, on these facts, father has not met his burden of proving that Tristen would benefit enough from continuing a relationship with father to justify foregoing the permanency offered by adoption.[5] At the time of the permanency planning hearing in January 2016, Tristen was only three and one-half years old and had been living away from his parents for the last 14 months. Although father lived with mother and Tristen prior to the minor's removal, he had not been in a relationship with mother for a number of years and the record does not disclose whether he assumed a day-to-day parental role with the minor. Father did indicate, however, that he had "not always been as dedicated and present to his son" as he should have been and that he had "little excuse" for not being aware of mother's drug use and the danger in which it placed

---

[4] Case law is divided as to the correct standard of review of an order determining the applicability of a statutory exception to termination of parental rights. (See *Autumn H., supra,* 27 Cal.App.4th at p. 576) [applying the substantial evidence standard]; *Jasmine D., supra,* 78 Cal.App.4th at p. 1351 [applying the abuse of discretion standard]; *K.P., supra*, 203 Cal.App.4th at pp. 621-622 [applying substantial evidence standard to whether the beneficial parent-child relationship exists; applying abuse of discretion standard to whether that relationship provides a compelling reason to apply the exception].) However, the "practical differences" among these standards of review are not significant (see *Jasmine D., supra,* 78 Cal.App.4th at p. 1351), and, on this record, our conclusion would be the same under any of these standards.

[5] Father argues on appeal that he maintained regular visitation and contact with Tristen, the first prong of the beneficial relationship analysis. (See *Helen W., supra*, 150 Cal.App.4th at pp. 80-81.) However, because we conclude that father failed to establish the second prong of the exception—that Tristen would benefit from continuing the relationship—we need not reach this issue.

10

Tristen prior to the boy's removal. He was also unable to provide any information on the boy's medical history. All of these circumstances argue against close parental involvement.

It is true that the Department reported father to be appropriate and loving with Tristen during visits and stated that the father-son bond between the two was "readily apparent to any observer." Further, Tristen was reported to love his parents and to be "solidly attached" to both of them. However, as stated above, for purposes of the beneficial relationship exception, "pleasant and cordial . . . visits are, by themselves, insufficient to mandate a permanent plan other than adoption." (*Brian R.*, *supra*, 2 Cal.App.4th at p. 924; *Beatrice M.*, *supra*, 29 Cal.App.4th at p. 1418 [even frequent and loving contact may be insufficient].) In this case, it is telling that father's visits were never increased in number or duration and remained supervised throughout the proceedings, likely because he declined to participate in the bulk of his reunification plan. While we agree with father that day-to-day contact is not essential to successfully invoke the beneficial relationship exception, this type of sporadic interaction is strong evidence that he was acting as a "friendly visitor" rather than a parent to the minor. (See *Casey D.*, *supra*, 70 Cal.App.4th at pp. 51-52 [failure to advance beyond supervised visitation makes it difficult to establish a parental, rather than a "caretaker or friendly visitor relationship" for purposes of the beneficial relationship exception].)

Under such circumstances—where father was not providing for his child's needs in any kind of sustained way—the juvenile court could reasonably determine that father did not occupy a parental role with Tristen. And this is precisely what the court did. Although it stated that father must have been a "very pleasing person" to have visited with Tristen, the court found that father's relationship with the minor was "incidental" and "certainly [did] not rise to the level to overcome the need for a stable placement." In sum, despite the evidence of a bond between father and son, there was really no showing here that terminating the minor's relationship with father would be detrimental to the child, especially when measured against the benefits of an adoptive placement.

11

In contrast, since his removal, Tristen had had his medical needs met and had shown "marked improvements" in speech, an area in which he was previously delayed. Further, the prospective adoptive parents are committed to providing a permanent home not only for Tristen, but also for his half-sibling Jacob, which will allow the minor to maintain his sibling relationship. According to the Department, the prospective adoptive parents are willing and able to provide both boys with "stability, permanence, diligent care and love." All of these factors tip the scales decisively in favor of adoption for this young child. Certainly, they do not present the kind of "exceptional circumstances" or "extraordinary case" necessary to invoke the beneficial relationship exception to adoption. (See *A.A., supra*, 167 Cal.App.4th at p. 1320, italics omitted; see also *K.P., supra*, 203 Cal.App.4th at p. 621.) We therefore decline to disturb the juvenile court's refusal to employ the beneficial relationship exception in this case.

### III. DISPOSITION

The judgment is affirmed.

_____
REARDON, J.

We concur:

_____
RUVOLO, P. J.

_____
RIVERA, J.

12